**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IRWIN GUZMAN, | Case No.: 16cv2659-MMA (AGS) |
| Petitioner, | **ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS;** |
| v. | [Doc. No. 39] |
| SPEARMAN, Warden, | |
| Respondent. | **DENYING REQUEST FOR EVIDENTIARY HEARING;** |
| | [Doc. No. 56] |
| | **DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY** |

Petitioner Irwin Guzman ("Petitioner"), a state prisoner proceeding *pro se*, has filed an Amended Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his 2013 conviction for eight counts of robbery (Cal. Penal Code § 211), and one count of assault with a deadly weapon (Cal. Penal Code § 245(a)(1)).[1] *See*

---

[1] Although this case was randomly referred to United States Magistrate Judge Andrew G. Schopler pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 72.1(d).

Doc. No. 39.  Respondent filed an answer, and Petitioner filed a traverse.  *See* Doc. Nos. 43, 56.  For the reasons set forth below, the Court **DENIES** the Petition.

<strong><span style="font-variant:small-caps">Factual Background</span></strong>

The factual background set forth below is excerpted from the California Court of Appeal's opinion.  *See* Doc. No. 35-17.[2]

A.  Robbery at the Mi Pueblo Market

On May 16, [2013,] a group of teenage boys, Ruben V., Juan L., Luis D., Jonathan R., David O., and Carlos F. were skateboarding in the parking lot of an abandoned Mi Pueblo Market in Escondido.  The shopping center was located near a flood control channel.  The channel runs throughout Escondido and is frequently used by gang members as a pathway.  While the youths were skating, they left their backpacks and other personal belongings up against a nearby wall.  Most of the skaters were taking a break from skateboarding and lying up against the wall when defendants Mendoza, Guzman, and Garcia jumped over a nearby fence and approached the skaters.  The trio approached the skaters and immediately began picking up the skaters' backpacks.  Jonathan and Juan were about five to six feet away from the rest of their group and still skateboarding when the robbery began.

Jonathan thought he heard somebody say, "Empty out your pockets."  Guzman pulled a hammer from his waistband and held it in a threatening manner while he picked up some of the backpacks.  While wielding the hammer, Guzman demanded David hand over his cell phone, and David complied.  Guzman also took Juan's and Jonathan's cell phones, which had been left lying by the wall.  Luis ran away when he saw the hammer, leaving his cell phone and headphones on top of Ruben's backpack.  Carlos attempted to leave with his backpack and skateboard, but Guzman knocked Carlos's skateboard out of his hands and seized his wallet and backpack.  Juan asked for his phone back from Guzman, to which Guzman replied, "Fuck you, it's mine now," while brandishing the hammer as if he was going

---

[2]  The Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C.  § 2254(e)(1); *see also Parke v. Raley*, 506 U.S.  20, 35-36 (1992) (holding that findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness).  Petitioner does not challenge the Court of Appeal's recitation of the facts.

to hit Juan.  After that exchange, Juan and Jonathan fled the scene on their skateboards.  After taking the skaters' belongings, the three defendants jumped back over the fence.  The skaters left the scene for a nearby Walgreens and called 911.

## B.  Robbery on Mission Avenue

Daniel M. and Abraham D. were skateboarding down the sidewalk on Mission Avenue, approximately two miles away from the abandoned market and approximately half an hour after the robbery.  They were both listening to music through headphones as they skated; Daniel was about 10 feet ahead of Abraham.  Mendoza jumped out in front of Abraham, forcing Abraham to jump off his skateboard.  Daniel, who was skating ahead of Abraham, stopped when he realized he could no longer hear Abraham skating behind him.  Daniel turned around, seeing a man standing in front of Abraham.  Daniel got off his skateboard and was approached by Garcia, who said to Daniel, "Give me your shit."  Daniel unplugged his headphones, and Garcia yanked them out of Daniel's shirt.  Garcia then walked towards Abraham and took Abraham's skateboard.

Mendoza and Guzman had surrounded Abraham when Garcia joined them.  Mendoza took a swing at Abraham with his fist, grazing Abraham's cheekbone.  Mendoza then took a hammer out of his waistband and demanded Abraham hand over his cell phone.  Abraham refused, and Mendoza swung the hammer at Abraham; however, Mendoza pulled his arm back as if he injured his arm and did not strike Abraham.  Mendoza returned the hammer to his waistband and then reached into Abraham's pocket for the phone.  Abraham took a step back, and Mendoza threatened to hit Abraham with the hammer if he did not comply.  Abraham finally allowed Mendoza to take his phone.

After the robbery, the three defendants got into an old gray Honda with a broken back window and drove away.  Shortly after the robbery, Abraham made a 911 call using Daniel's cell phone.

## C.  Traffic Stop

Approximately five hours following the robberies, Escondido police officers from the Gang Enforcement Team ("GET") attempted to stop a gray Honda with a broken rear window in an area considered Diablos gang territory.  The car had four persons inside of it.  After spotting the car, the

officers confirmed the license plate number matched that of the getaway car described by Abraham. The driver refused to stop, and police pursued the car into the parking lot of an apartment complex, where the driver and passengers bailed out of the still moving car and attempted to escape on foot. Police apprehended Garcia, Mendoza and Guzman as they attempted to flee. Inside the Honda, police found a hammer, backpacks, cell phones and cell phone chargers. Ruben's backpack and its contents were recovered, as were Luis's cell phone and headphones. Carlos's wallet, with his school identification card still inside, was also found in the car. The police recovered Juan's backpack from the car, but not his cell phone. No items taken from David, Daniel or Abraham were found in the car.

D. Identification

After stopping the gray Honda, police contacted Daniel and Abraham and transported them to the apartment parking lot for a curbside lineup at around midnight. Daniel did not recognize any of the three men presented to him, but Abraham identified all three men as being his assailants. Both Daniel and Abraham did recognize the gray Honda as the vehicle their assailants used in driving away from the robbery.

After the curbside lineup, police prepared three separate six-pack photo arrays to show the victims of the earlier marketplace robbery. The photos were shown to the victims the day after the robbery. Ruben, Jonathan and Carlos recognized Guzman as the robber who wielded a hammer. Luis did not recognize anyone in the photo arrays.

At trial, Ruben initially did not identify Guzman as the robber wielding the hammer, but he positively identified Guzman on the second day of trial. Juan also identified Guzman in court as the robber with a hammer. Jonathan and David did not recognize any of the defendants at trial. Juan recognized Mendoza as being one of the robbers; however, Juan did not identify Garcia as the third robber. Juan stated that the third robber was someone that he went to school with and that he did not see him in court. Carlos identified all three defendants in court, stating that Mendoza was the robber who wielded the hammer. Abraham identified all three defendants in court, specifically identifying Mendoza as the man who wielded the hammer. Daniel was unable to identify any of the defendants in court.

*Id.* at 3-7.

/ / /

## PROCEDURAL BACKGROUND

On October 8, 2013, a California jury found Petitioner guilty of eight counts of second-degree robbery and one count of assault with a deadly weapon. *See id.* at 3. The jury also concluded that Petitioner used a deadly weapon in the commission of six of the robberies and found that all nine felonies were committed for the benefit of a criminal street gang. *See id.* Petitioner was sentenced to twenty-six years and four months in prison. *See id.*

After sentencing, Petitioner appealed to the California Court of Appeal, which affirmed. *See id.* at 1. From there, Petitioner applied to the California Supreme Court for review, but was denied without opinion. *See* Doc. No. 35-21 at 1. Petitioner did not file a state collateral attack. Instead, he filed his Petition in this Court pursuant to 42 U.S.C. § 2254. *See* Doc. No. 39. Petitioner presents five claims for relief: (1) substantial evidence did not support the jury's true findings on the gang enhancement in violation of Petitioner's due process rights; (2) the trial court erred by denying a defense motion to bifurcate the trial as to the gang enhancement allegations in violation of Petitioner's rights to due process and a fair trial; (3) impermissibly suggestive pre-trial identification procedures and tainted in-court identification of Petitioner violated his rights to due process; (4) jury instructions permitted the jury to equate motive and intent for purposes of proof of the intent requirement for the charged offenses and the gang enhancement which denied Petitioner of his due process right to proof of all elements of the charged offenses and the gang allegations beyond a reasonable doubt; and (5) the cumulative effect of the trial errors rendered Petitioner's trial fundamentally unfair in violation of his due process rights. *See id.*; *see also* Doc. No. 56.[3]

---

[3] Petitioner also argued that the jury instruction on the intent portion of the gang enhancement instruction lacked a knowledge element and "failed to properly instruct on specific intent." Doc. No. 39 at 2. In his traverse, however, Petitioner abandons this claim and "seeks to have [it] dismissed." Doc. No. 56 at 23. As such, the Court **DISMISSES** this claim for relief. *See Daniels v. Davey*, No. 1:15-cv-01211-DAD-MJS, 2016 WL 282694, at *1 n.1 (E.D. Cal. Jan. 25, 2016) (recognizing that a "petitioner is the master" of his "petition").

**LEGAL STANDARD**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern federal habeas corpus petitions. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under AEDPA, a federal habeas corpus petition will not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless that adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7–8 (2002). "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002). Under § 2254(d)(1), a federal habeas court may grant relief under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the United States Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Shammam v. Paramo*, 664 F. App'x 629, 630 (9th Cir. 2016) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

For purposes of federal habeas corpus review under § 2254(d), clearly established federal law means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and refers to the holdings, as opposed to the dicta, of Supreme Court decisions. *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003). A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th

Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court must be "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the [state court's] finding[s] [are] supported by the record." *Murray v. Schriro,* 745 F.3d 984, 1012 (9th Cir. 2014) (citing *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). Here, the California Court of Appeal gave a reasoned opinion as to Petitioner's claims, and so the Court looks through to that opinion as the basis for the state court denial. *See* Doc. No. 35-17.

### DISCUSSION

### A. Gang Enhancement: Sufficiency of the Evidence

Petitioner first challenges the Court of Appeal's conclusion that sufficient evidence supported the jury's finding that he committed the offenses for the benefit of a criminal street gang. "[A] due process claim challenging the sufficiency of the evidence can only succeed when, viewing all the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018) (quotation marks omitted). The Court must apply a "second level of deference" to the state court's determinations in habeas corpus proceedings. *Id.* As such, the Court "must conclude that the state court's determination that a rational jury could have found each required element proven beyond a reasonable doubt was not just wrong but was objectively unreasonable." *Id.* at 1056-57.

In addressing this argument, the Court of Appeal stated:

> In this case, there is substantial evidence to support an inference that defendants committed the crimes in association with the Diablos street gang and that they had a specific intent to assist in criminal conduct by Diablos

gang members:  Mendoza and Guzman were known members of the Diablos gang, and there is sufficient evidence to draw an inference that they relied upon their gang membership in conducting the robberies.  It can be reasonably inferred based upon expert testimony and the circumstances of the crimes that Mendoza and Guzman knew that, as fellow Diablos gang members, they could count on each other to assist when engaging in crimes of opportunity against victims in their territory and could count on the other gang members' silence if confronted by the police.

While Garcia is a documented member of a different gang in a different part of San Diego County, this fact would not prevent a reasonable fact finder from nonetheless finding that he committed the armed robberies in association with and for the benefit of the Diablos.  Our state high court's recent ruling in *People v Prunty* (2015) 62 Cal.4th 59, 71-72 (*Prunty*) does not foreclose the possibility of such a conviction, because while expert witnesses did not submit evidence proving that the Eastside gang is either a criminal street gang or a subset of a larger criminal gang to which both Eastside and the Diablos are associated, section 186.22, subdivision (b) does not require that a defendant be a member of a criminal street gang, only that the defendant commits a felony either to benefit a gang, or in association with a gang and that the defendant has a specific intent to aid gang members in the commission of a felony.

Garcia worked with the Diablos gang members in the armed robberies, and they apparently relied upon and trusted him as if he were one of them.  An expert witness also testified that there was a great deal of crossover between Hispanic criminal street gangs in San Diego County.  Given these facts, a reasonable jury could have inferred that Garcia committed the armed robberies in association with and support of the Diablos even if he was not formally a member of that organization.  The fact that the armed robberies occurred in Diablos territory and armed robbery of members of the public is a crime that was identified by an expert witness as one of the primary criminal activities of the Diablos gang support a strong inference that all three defendants committed the armed robberies with the intent of assisting Diablos gang members in conducting criminal activity, thus satisfying both prongs of section 186.22, subdivision (b).

Doc. No. 35-17 at 26-28 (citation and footnote omitted).

"California's gang enhancement applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any

criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" *Johnson*, 899 F.3d at 1057 (quoting Cal. Penal Code § 186.22(b)(1)). The government must prove: (1) that the "crime be related to a gang"; and (2) that the defendant "specifically intended to assist a gang member's crime." *Id.* It appears that Petitioner challenges both prongs.

### 1. Related to a Gang

Petitioner takes issue with the Court of Appeal's analysis because, although the evidence indicated both he and Mendoza were Diablos gang members, Garcia was a member of a different gang. Thus, he argues, "there was no evidence of any kind indicating these crimes were gang related." Doc. No. 56 at 4. Petitioner further contends that there were no gang tattoos, signs, or yelling during the commission of the robberies, showing that the victims did not know that Petitioner and his codefendants were in a gang.

The government can prove this first prong by showing that the eight robbery counts and the assault count were at the direction of, in association with, or for the benefit of a gang. *Johnson*, 899 F.3d at 1057. Because the statute is disjunctive, the state need only prove one of the three. *See id.*

"Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang." *Id.* Moreover, a "crime is committed in association with the gang if the defendants relied on their common gang membership and the apparatus of the gang when they committed the crime." *Id.* (quotation marks omitted).

Here, Petitioner committed the crime with fellow Diablos gang member Mendoza. The Court of Appeal's conclusion that Garcia's involvement did not alter this result, despite the fact that he is a member of a different gang, is not unreasonable. Specifically, the court noted the expert's testimony concerning the overlap of Hispanic gangs in the area. *See* Doc. No. 35-17 at 28. The court also noted that Garcia worked with the Diablos regularly, the Diablos trusted him, and the Diablos treated him as one of their

own.  *Id.*  Finally, the jury could reasonably conclude that the three individuals relied on the apparatus of the gang because they used the "flood control channel" located near the Mi Pueblo Market to escape from the first six robberies, which was a "pathway" "frequently used by gang members."  Doc. No. 35-17 at 4; *see also* Doc. No. 35-4 at 80; Doc. No. 35-8 at 43-44.

But even if there is insufficient evidence to show that Petitioner's actions were "in association with" the Diablos, there is sufficient evidence to show the actions were "for the benefit of" the Diablos.  In *Johnson*, the Ninth Circuit concluded that the following facts were sufficient to show the crimes were "for the benefit of" the Project Watts Crips gang, notwithstanding the fact only one of the two individuals that committed the robbery were members of that gang:

> (1) the robbery was a violent crime, committed with a gun pointed directly into the face of a victim, (2) the robbery occurred within the territory of the Project Watts Crips, (3) robbery is one of the primary activities of the Project Watts Crips, (4) the robbery occurred in broad daylight, (5) the robbery was brazen because it involved multiple victims and occurred at a time of the day, roughly 9:00 a.m., when neighbors were most likely to observe the crime; (6) King had numerous tattoos, including some visible on his face and hands, indicating membership in the Project Watts Crips, (7) during the robbery, either Johnson or King used the term "cuz," a term used by members of Crips gangs, and (8) the victims were ordinary members of the public with no personal relationship with the defendants or gangs.

899 F.3d at 1058.  A gang expert "testified that violent crimes benefit a gang by increasing the intimidation in the community, lowering reporting rates among witnesses, and allowing the criminal enterprise to continue free from police restraint."  *Id.*  "The gang expert also opined that such crimes bestow 'respect' on the individual and elevate the status of the gang."  *Id.*  The court explained that these facts were "sufficient for a jury to infer that the crime was meant to send a message to the public about gang brutality and control" in their territory.  *Id.*

Here, the Diablos gang expert testified that the Diablos "frequently commit crimes against members of the public in their home turf" and by doing so "benefit the gang by instilling fear within the surrounding community." Doc. No. 35-17 at 21. "Members of the Diablos gang are expected to automatically back up their fellow gang members if a member decides to commit a crime of opportunity against a member of the public." *Id.* Indeed, the expert opined that "the primary purpose and activity of the Diablos gang is to commit crimes such as robbery, assault with a deadly weapon, and making criminal threats." *Id.* Finally, the expert explained that "respect" is a "core value" of gangs, gained through the commission of crimes by gangs and individual gang members. Doc. No. 35-8 at 20-21.

Similar to *Johnson*, (1) the robberies were violent crimes involving physical violence and threats of violence with a hammer, (2) the robberies occurred within the Diablos' territory (*see* Doc. No. 35-8 at 85-86), (3) the expert testified that robbery is one of the primary activities of the Diablos, (4) the first robbery occurred in broad daylight and the second occurred in twilight hours (*see* Doc. No. 35-4 at 103; Doc. No. 35-6 at 19, 64), (5) the robberies were brazen because they involved multiple victims and one of the robberies was on a public street (Doc. No. 35-6 at 65), (6) both Petitioner and Mendoza were documented and known members of the Diablos, and (7) the victims were ordinary members of the public with little or no personal relationship with the defendants or gangs (*see* Doc. No. 35-4 at 121; Doc. No. 35-5 at 113; Doc. No. 35-6 at 150-51; *but see* Doc. No. 35-5 at 148-49 (one victim identifying one of the defendants as someone he went to school with)). Although Petitioner and his codefendants did not use any lingo associated with members of the Diablos, the Court finds that the Court of Appeal reasonably determined that the evidence was sufficient for a rational jury to conclude that the robberies were "for the benefit of" the Diablos. *See Johnson*, 899 F.3d at 1058.

### 2. Specific Intent to Assist a Gang Member

Petitioner also challenges the specific intent prong, arguing that the Court of Appeal allowed the gang expert's testimony to serve as the sole basis to determine

specific intent because, according to Petitioner, that was the only evidence offered concerning his intent to assist any gang. *See* Doc. No. 56 at 4. Petitioner's argument, however, is foreclosed by the California Supreme Court's interpretation of this element: "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." *People v. Albillar*, 244 P.3d 1062, 1076 (Cal. 2010). Critically, the California Supreme Court interpreted the second prong to require proof that a defendant had a "specific intent to promote, further, or assist in any felonious criminal conduct by gang members." *Id.* at 1075. Moreover, felonious criminal conduct does not have to be old conduct; it can be the instant offense if that offense is committed with another known gang member. *Id.* Here, a rational jury could conclude that Petitioner had the specific intent to assist Mendoza—a fellow Diablos—in the commission of these felonious robberies, and thus Petitioner's challenge to the second prong similarly fails. *See id.* at 1076.

Accordingly, Petitioner fails to demonstrate that the California courts' denial of this claim was contrary to, or an unreasonable application of, established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented.

## B. Gang Enhancement: Failure to Bifurcate

Petitioner next claims that the trial court's refusal to bifurcate proof of the gang enhancement violated his due process rights. The Supreme Court, however, has not recognized that a trial court's denial of a motion to bifurcate trial of the gang enhancement implicates the Due Process Clause; thus, there is no clearly established federal law. *See Stenson v. Lambert*, 504 F.3d 873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law."); *see also Demirdjian v. Gipson*, 832 F.3d

1060, 1066 (9th Cir. 2016) (noting that federal courts cannot "grant habeas relief unless the California Court of Appeal's decision on that claim was 'contrary to, or involved an unreasonable application of' clearly established Supreme Court authority") (quoting 28 U.S.C. § 2254(d)(1)).

Rather, the Supreme Court's jurisprudence on bifurcation and misjoinder of claims suggests that there is no constitutional right to bifurcation. *See Spencer v. Texas*, 385 U.S. 554, 568 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."). The closest the Supreme Court has come to holding otherwise is in a footnote stating, "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). But the Ninth Circuit has squarely held that "the statement in *Lane* regarding when misjoinder rises to the level of constitutional violation was dicta" and thus does not serve to clearly establish federal law for habeas corpus purposes. *Runningeagle v. Ryan*, 686 F.3d 758, 776 (9th Cir. 2012); *accord Collins v. Runnels*, 603 F.3d 1127, 1133 (9th Cir. 2010) ("The footnote upon which Collins relies did not set forth the governing legal principle in *Lane*. It was merely a comment."). The Ninth Circuit has continued to refuse to provide habeas corpus review of bifurcation decisions, at least in non-death penalty cases. *Compare Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution."); *Hollie v. Hedgpeth*, 456 F. App'x 685, 685 (9th Cir. 2011) ("The Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process."); *with Davis v. Woodford*, 384 F.3d 628, 638-39 (9th Cir. 2004) (reviewing a habeas "joinder challenge" in the death penalty context).

Even if the Court were to apply the standard set forth in the Ninth Circuit's death-

penalty jurisprudence, Petitioner fails to demonstrate any fundamental unfairness. A bifurcation challenge can only be successful if the denial "resulted in an unfair trial. There is no prejudicial constitutional violation unless simultaneous trial of more than one offense actually rendered petitioner's state trial fundamentally unfair and hence, violative of due process." *Davis*, 384 F.3d at 638 (alterations and quotation marks omitted). The Ninth Circuit focuses "particularly" on the cross admissibility of evidence and the danger of "spillover" from one charge to another but also considers whether one charge or set of charges is weaker than another. *Id.*

The California Court of Appeal considered the question of cross admissibility in Petitioner's case, stating that:

> Here, evidence of defendants' robbery spree was relevant and probative not only with respect to the gang enhancement but also with respect to their motive in committing the robberies and, in particular, establishing Garcia's role and motive in assisting Guzman and Mendoza. Thus, much of the evidence related to the gang enhancement would have been admissible in a separate trial of the robberies. Moreover, the gang evidence was not any more inflammatory than the victims' testimony about the robberies.

Doc. No. 35-17 at 9. The Court agrees that much of the evidence would have been admissible in a separate trial. Moreover, the "State did not join a strong evidentiary case with a much weaker case in the hope that the cumulation of the evidence would lead to convictions in both cases." *Davis*, 384 F.3d at 639 (quotation marks omitted). Rather, the State had a strong case in both the substantive offenses and in the gang enhancement. Also, as in *Davis*, the trial court "further limited" any prejudice through an instruction to the jury to consider each count separately and to consider the gang evidence for limited purposes. *Id.*; *see also* Doc. No. 35-17 at 19 n.5 ("You may not consider this [gang] evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."). As such, even if it were clearly established that bifurcation decisions are challengeable under

the Due Process Clause in habeas corpus proceedings, Petitioner's argument fails.  Thus, Petitioner is not entitled to relief on this claim.

Finally, in his direct appeal through the California courts, Petitioner primarily argued that the trial judge abused his discretion under California common law relating to bifurcation.  To the extent Petitioner requests that the Court reconsider those state-law rulings, such a request is not cognizable under federal habeas review.  *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Simple errors of state law do not warrant federal habeas relief.").

## C. Identifications

Petitioner further asserts that the in-court identifications were tainted by unduly suggestive out-of-court identification procedures and thus violated his due process rights. The use of out-of-court identification procedures do not automatically violate due process; "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."  *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012).  "Even when the police use such a procedure . . . suppression of the resulting identification is not the inevitable consequence."  *Id.* at 239. Instead, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  "Reliability of the eyewitness identification is the linchpin of that evaluation" and only "[w]here the indicators of a witness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, [should] the identification be suppressed."  *Id.* at 239 (alterations and quotation marks omitted).

"To determine whether an identification procedure violates a defendant's due process rights, a court must consider whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *United States v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2008) (quotation marks omitted). Courts consider a variety of factors, including "the opportunity of the witness to view the

criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* (alteration and quotation marks omitted).

### 1. Curbside Lineup

Petitioner argues first that the curbside lineup with Abraham and Daniel tainted the in-court identifications. Petitioner contends that the lineup was unduly suggestive because the officers told the victims that they caught the guys in the car the victims had reported, the car was in the parking lot when the victims arrived, Petitioner was in handcuffs and surrounded by officers, the victims were presented the culprits individually, and there was a lack of exigency to justify these procedures. *See* Doc No. 56 at 9-10.

The Court of Appeal summarized the facts concerning Abraham and Daniel as follows:

On direct examination, Abraham explained that police called his home and told him that "they had caught the guys." However, at that point, Abraham was not told that he would be asked to identify anyone at a curbside lineup. Later, a police officer came to Abraham's house and explained that she was going to take him to a curbside lineup. After Abraham and his mother were in the officer's patrol car, but before leaving Abraham's home, the police officer read him an admonishment, which advised Abraham that he should not infer any guilt just because someone had been detained, that he did not have to identify anyone and that it was just as important to free an innocent person as to identify someone involved in the crime.

According to Abraham, he understood that he was going to the curbside lineup so that he could "[n]otify the cops *if* those were *the correct* guys." (Italics added.) Abraham stated that he was able to identify Mendoza as the one who stole his cell phone based on his recollection of the robber's facial features, clothes, height and weight and physical build; Abraham was able to identify Garcia as the one who robbed Daniel based on his recollection of the second robber's clothes and height; and Abraham was

able to identify Guzman as the getaway driver based on his recollection of the driver's long straight hair.

Daniel testified that he also received a call from Escondido police officers in which he was told that the police had stopped some people they thought might be involved in the robbery. Daniel was given the same admonishment provided to Abraham. As we have indicated, Daniel was unable to identify any of the defendants as one of the robbers, but he did recognize the Honda as the getaway car.

Doc. No. 35-17 at 12-13 (footnote omitted). Relying on these facts, the court reasoned:

[B]efore asking the two victims to identify the defendants, each victim was admonished that they were not to infer guilt from the fact that any of the individuals were detained and that they were not obligated to identify anyone. The admonishment was effective with both Abraham, who testified that he understood his role was to notify the police "*if* they were the *correct* guys*," (italics added) and Daniel, who plainly felt no suggestion or pressure because he was unable to identify any of the defendants as suspects but did recognize the Honda as the getaway car. Given these circumstances in the record, which show that the witnesses acted independent of any suggestion or pressure that may have been expressed or inherent in the circumstance, defendants did not meet their burden of showing that the statements the police made to the witnesses before the lineup were unduly suggestive or that the identification Abraham made six hours after the robbery was in any way unreliable.

*Id.* at 13-14.

Here, upon review of the record, the Court finds that the state courts' adjudication of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Although "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned," *Stovall v. Denno*, 388 U.S. 293, 302 (1967) *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), "the admission of evidence of a showup without more does not violate due process." *Neil*, 409 U.S. at 198. Indeed, "[o]ne-on-one identifications are sometimes necessary because of officers' and

suspects' strong interest in the expeditious release of innocent persons and the reliability of identifications made soon after and near a crime." *Morris v. Carey*, No. 2:06-cv-0354 GEB JFM P., 2010 WL 231379, at *16 (E.D. Cal. Jan. 13, 2010).

The curbside lineup was not unduly suggestive nor was the testimony from Daniel or Abraham rendered constitutionally unreliable. *See Perry*, 565 U.S. at 239 (holding that "reliability" is the "linchpin" of the evaluation). Both Daniel and Abraham had adequate time to observe the undisguised robbers. *See* Doc. No. 35-17 at 13. Their attention was undividedly on the robbers, since the robbery was committed in the immediate vicinity of the boys and the group exchanged both words and physical contact with the witnesses. Abraham gave clear, descriptive reasons for his belief that he had correctly identified the attackers and the lineup occurred shortly after the incident in question. Additionally, courts have held that admonishments like those given to Abraham and Daniel reduce the suggestive nature of an identification procedure. *See, e.g.*, *United States v. White*, 38 F. App'x 426, 427 (9th Cir. 2002) ("The in-field identification procedure was not impermissibly suggestive because the officers admonished each witness that there was no obligation to identify anyone and each witness viewed the defendants independently from the other witnesses."). Finally, the admonishment given was clearly impressed on both Daniel and Abraham, as Abraham testified he knew his job was to look for the "correct guys," and Daniel was unable to positively identify any of the subjects. Doc. No. 35-17 at 13. Accordingly, Petitioner has not met his burden to show that the state courts' conclusion that the admission of the curbside lineup was proper was contrary to, or involved an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts.

### 2. Photo Array

Petitioner next argues that the in-court identifications of the victims of the first robbery were tainted by the photo arrays the police showed them the day after the robbery. Petitioner argues that there was only one other man with long hair in the photo and that others in the photo "grossly dissimilar in appearance" to him in violation of

*United States v. Wade*, 388 U.S. 218, 233 (1967).  *See* Doc. No. 56 at 12.  The Court of Appeal summarized the facts concerning the relevant witnesses as follows:

> Six of the victims at the Mi Pueblo Market robbery were shown three separate six-pack photo lineups (six-pack); each six-pack included a picture of one of the defendants.  The six-packs were prepared with the assistance of a computer program that selected photographs of individuals with physical characteristics similar to each of the defendants and organized the photographs randomly.
>
> The six-packs were shown to the six victims at Ruben's house.  Ruben testified that he was told by the police that they had recovered various items and that three people were in custody.  However, each victim was admonished that they did not have to identify anyone in the lineup and that they should not assume that anyone whose picture was in the lineup was in custody.  Each victim was shown the six-packs separately.  Three of the victims—Ruben, Jonathan, and Carlos—were able to identify Guzman; only two of the victims—Ruben and Carlos—were able to identify Mendoza; none of the victims was able to identify Garcia.

Doc. No. 35-17 at 14.

Petitioner contends that the six-pack photo array, which included his photo, was unduly suggestive.  The Court of Appeal reasoned that "courts have upheld lineup identifications despite the existence of similar or greater disparities among lineup participants," thus, the fact that "the Guzman six-pack included one other person with long hair and only three of the victims were able to identify him," rendered the lineup "not unduly suggestive."  *Id.* at 15.

Petitioner argues that the Court of Appeal's ruling was unreasonable because the six-pack array only contained one other individual with long hair and he was the only individual wearing a white shirt.  Petitioner primarily focuses on the hair length, since he correctly notes that some of the witnesses testified that they recognized him, in part or in whole, due to his hair.  *See, e.g.*, Doc. No. 35-5 at 174, 204.  The following six-pack was shown to the witnesses:



Doc. No. 63 at 4. Petitioner is the top-center subject.

Although the habeas review standard is far more deferential, even if the Court performed a *de novo* review, the Court finds that the photo array in question is not unduly suggestive. While only two of the subjects, including Petitioner, appear to have longer-than-shoulder-length hair, none of the subjects have short hair, and all but one of the subjects have hair reaching at least to each subjects' collar. The subjects all appear to be of approximately the same age, have similar skin tones, all but one have on similar shirts (although of a different color), all but one are clean shaven, and all have the same hair color. The instructions of the lineup also warn that "hairstyles, beards and mustaches may be easily changed." Doc. No. 63 at 4. Given the "totality of the circumstances," the photographic lineup was not unduly suggestive because of either the color of Petitioner's shirt or his hair length. *Drake*, 543 F.3d at 1088. As the Court of Appeal noted, this conclusion is reinforced by the fact that several of the witnesses shown this lineup failed

to select Petitioner from the lineup or at trial.

Indeed, the Ninth Circuit has rejected similar challenges. *See United States v. Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005) (concluding that the photospread "was not so impermissibly suggestive as to create a substantial likelihood of misidentification" where all of the subjects are Caucasian males in the same age range, with similar skin, eye, and hair coloring, and where "[f]our of the six photos show men with similar length hair, but two having somewhat shorter hair"); *United States v. Nash*, 946 F.2d 679, 681 (9th Cir. 1991) ("Nash criticizes the photospread because one of the photographs was of a Latino man, only Nash and two others had light complexions, and only Nash and the man Nash contends is Latino had afro hairstyles. We find the photospread to be a balanced presentation that was not suggestive."); *see also United States v. Mack*, No. 99-50595, 2000 WL 1171143, at *1 (9th Cir. Aug. 17, 2000) ("We have held that a photospread is not impermissibly suggestive even though the pictures vary in race and hair style. . . . The minor discrepancies among the photos do not make the photospread impermissibly suggestive."). In light of the foregoing, the Court finds that state courts' conclusion that admission of the photo array was proper was not contrary to, nor an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts.

### D. Jury Instructions

Petitioner also challenges the California Court of Appeal's ruling concerning the jury instructions. Generally, federal courts do not grant relief to a petitioner based on a challenge to a state jury instruction, even an erroneous one, in a petition for a writ of habeas corpus. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To receive relief at this stage, Petitioner must show that the challenged instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quotation marks omitted). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quotation marks omitted).

Petitioner challenges the use of model California jury instructions—CALCRIM Nos. 370, 1401, and 1403. Petitioner argues that the instructions confused the jury by inadequately explaining the difference between the intent required to commit the gang enhancement and the concept of motive for committing the robberies. *See* Doc. No. 56 at 22. According to Petitioner, this relieved the prosecution of its burden to prove the intent component of the gang enhancement beyond a reasonable doubt. *See id.* The California Court of Appeal found Petitioner's argument unpersuasive, citing to *People v. Fuentes*, 171 Cal. App. 4th 1133, 1139-40 (2009), which rejected the same argument in a virtually identical situation. Here, CALCRIM 370 addressed the concept of motive for the robbery charges and the assault:

> The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive.
>
> Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty.

Doc. No. 35-17 at 19 n.5. By contrast, the pertinent sections of the CALCRIM 1401 instruction addressed only the gang enhancement:

> If you find the defendant guilty of the crimes charged in Counts 1 through 9, you must then decide whether the People have proved the additional allegation that the defendant committed each of those crimes for the benefit of, at the direction of, or in association with a criminal street gang.
>
> To prove this allegation, the People must prove that:
>
> 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; AND
> 2. The defendant intended to assist, further, or promote criminal conduct by gang members.
>
> . . .

The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved.

*Id.* at 17-18.  The CALCRIM 1403 instruction provides:

You may consider evidence of gang activity only for the limited purpose of deciding whether:

The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged;
    OR
The defendant had a motive to commit the crimes charged.

You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.

You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

*Id.* at 19.

Contrary to Petitioner's argument, CALCRIM 370 by its express terms applies only to the substantive charges and thus did not modify CALCRIM 1401.  Indeed, CALCRIM 1401 provides that the jurors should not even consider the instruction unless they had already found the defendants guilty of the substantive charges.  If the jurors reached that stage, CALCRIM 1401 provides clear instructions to consider Petitioner's intent.  Petitioner attempts to distinguish his case from *Fuentes* because in his trial the jury was also instructed on CALCRIM 1403, which further confused motive and intent.  *See* Doc. No. 56 at 22.  However, CALCRIM 1403 specifies that the gang-activity evidence could be used to determine general motive for the substantive crimes, the specific intent required by the gang enhancement, or credibility, but for no other purpose.  The fact that the same evidence could be considered for different purposes is neither surprising nor confusing in a criminal case, and a clear instruction limiting the use of

such evidence for a specific purpose is neither unusual nor inappropriate. Thus, Petitioner fails to show that he is entitled to federal habeas corpus relief because the instructions "so infected the entire trial" such that the resulting conviction violates due process.[4] *Middleton*, 541 U.S. at 437; *see also Estelle*, 502 U.S. at 72.

## E. Cumulative Error

Lastly, Petitioner argues that the cumulative impact of all of the alleged errors prejudiced him, requiring a new trial. *See Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) ("[P]rejudice may result from the cumulative impact of multiple deficiencies."). However, because Petitioner fails to identify any errors, there can be no constitutional violation based on the alleged cumulative impact of the alleged errors. *See Hays v. Farwell*, 482 F. Supp. 2d 1180, 1202 (D. Nev. 2007) ("The cumulative error doctrine, however, does not permit the Court to consider the cumulative effect of non-errors."); *see also Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999), *overruled on other grounds*, *Slack v. McDaniel*, 529 U.S. 473 (2000) ("where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation").

## F. Evidentiary Hearing

Petitioner further requests an evidentiary hearing. *See* Doc. No. 56. "A habeas petitioner is entitled to an evidentiary hearing if: (1) the allegations in his petition would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Phillips v. Woodford,* 267 F.3d 966, 973 (9th Cir. 2001) (emphasis omitted). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an

---

[4] Numerous courts have reached the same conclusion regarding these instructions. *See, e.g.*, *Gonzalez v. Montgomery*, No. SACV 15-2150-PA (LAL), 2017 WL 3429375, at *17 (C.D. Cal. Mar. 10, 2017); *Martinez v. Hubbard*, No. CV 11-5640-JAK (PLA), 2015 WL 9997226, at *23 (C.D. Cal. Nov. 12, 2015); *Phillips v. Foulk*, No. EDCV 11-599-DOC (DTB), 2013 WL 3337825, at *17 (C.D. Cal. July 1, 2013); *Binns v. Allison*, No. CV 11-10241-DSF (DTB), 2013 WL 3200503, at *13 (C.D. Cal. June 24, 2013); *Orono v. Hedgepeth*, No. 1:12-CV-00581 LJO GSA HC, 2012 WL 3704815, at *22 (E.D. Cal. Aug. 24, 2012).

evidentiary hearing." *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).  Here, the Court finds that the record precludes habeas relief and the Court does not need any additional facts to adjudicate his Petition.  Accordingly, the Court **DENIES** Petitioner's request for an evidentiary hearing.

### CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases states that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Here, the Court concludes that Petitioner has not made the required showing.  Accordingly, the Court **DECLINES** to issue a certificate of appealability.

### CONCLUSION

Based on the foregoing, the Court **DISMISSES** the Petition **with prejudice**.  Further, the Court **DENIES** Petitioner's request for an evidentiary hearing, and **DECLINES** to issue a certificate of appealability.  The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated:  November 28, 2018

HON. MICHAEL M. ANELLO
United States District Judge